DELBELLO DONNELLAN WEINGARTEN
WISE & WIEDERKEHR, LLP
*Attorneys for the Debtor*
One North Lexington Avenue
White Plains, New York 10601
(914) 681-0200

JONATHAN S. PASTERNAK
ERICA R. FEYNMAN

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

In re:                                                             Chapter 11
                                                                   Case No. 11-15624 (REG)

261 EAST 78 REALTY CORPORATION,

                                    Debtor.
-------------------------------------------------------------X

## DEBTOR'S' DISCLOSURE STATEMENT UNDER
## CHAPTER 11 OF THE BANKRUPTCY CODE

 261 East 78 Realty Corporation (the "Debtor") hereby proposes the following Disclosure

Statement[1] pursuant to Section 1125(b) of Title 11, United States Code, 11 U.S.C. §§ <u>et</u> <u>seq.</u> (the

"<u>Bankruptcy</u> <u>Code</u>") and Rule 3017 of the Federal Rules of Bankruptcy Procedure (the

"<u>Bankruptcy</u> <u>Rules</u>"), in connection with its Plan of Reorganization dated March 15, 2013 (the

"<u>Plan</u>") to all known holders of claims against or interests in the Debtor in order to adequately

disclose information deemed to be material, important and necessary for the Debtor's creditors to

make a reasonably informed judgment about the Debtor's Plan.  A copy of the Plan is attached

hereto as **Exhibit "A."** All capitalized terms used but not defined in this Disclosure Statement

shall have the respective meanings ascribed to them in the Plan unless otherwise noted.

1

The Bankruptcy Court has scheduled the hearing on confirmation of the Plan for June __, 2013 at 9:45 a.m.  Under Section 1126(b) of the Bankruptcy Code, only Classes of Claims that are "impaired" under the Plan, as defined by Section 1124 of the Bankruptcy Code, are entitled to vote on the Plan. **Holders of Claims in Class 1 and Interests in Class 5 are not required to vote on the Plan and are conclusively presumed to have accepted the Plan because their Claims are not impaired. Holders of Claims in Classes 2, 3 and 4 are impaired, inasmuch as they will receive a lesser amount on account of their Claims than they would be entitled to under applicable law. A Class is impaired if its legal, contractual or equitable rights are materially altered or reduced.  This means that a creditor or class whose rights are impaired will receive less than they would have received, and at a later date, than they would have in the absence of an insolvency proceeding. Accordingly, Holders of Claims in Classes 2, 3 and 4 are entitled to vote. Pursuant to Section 1126 of the Bankruptcy Code, the Plan must be accepted by more than one half in number and two-thirds in amount of at least one class of impaired creditors of those voting in order for the Plan to be confirmed. Holders of  Interests in Class 5 are unimpaired and are deemed to accept the Plan.**

---

[1] Unless otherwise defined herein, capitalized terms used in this Disclosure Statement shall be defined as set forth in the Plan.

NO REPRESENTATIONS CONCERNING THE DEBTOR IS AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS STATEMENT. ANY REPRESENTATIONS WHICH ARE OTHER THAN AS CONTAINED IN THIS STATEMENT SHOULD NOT BE RELIED UPON BY YOU, AND ANY SUCH REPRESENTATIONS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR, DELBELLO DONNELLAN WEINGARTEN WISE & WIEDERKEHR, LLP, ONE NORTH LEXINGTON AVENUE, WHITE PLAINS, NY 10601, ATTENTION: JONATHAN S. PASTERNAK, ESQ., WHO IN TURN SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE. THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. FOR THE FOREGOING REASON, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THE INFORMATION CONTAINED HEREIN WITHOUT ANY INACCURACY, ALTHOUGH GREAT EFFORTS HAVE BEEN MADE TO BE ACCURATE.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN. WHILE THE EQUITY HOLDERS BELIEVE THAT THE SUMMARY IS FAIR AND ACCURATE, SUCH SUMMARY IS QUALIFIED TO THE EXTENT THAT IT DOES NOT SET FORTH THE ENTIRE TEXT OF THE PLAN. REFERENCE IS HEREBY MADE TO THE PLAN FOR A COMPLETE STATEMENT OF THE TERMS AND PROVISIONS THEREOF. **IF ANY INCONSISTENCIES EXIST BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PLAN SHALL CONTROL.**

THE STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE MADE AS

OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED IN THIS DISCLOSURE STATEMENT. THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN ANY FACTS SET FORTH IN THIS DISCLOSURE STATEMENT SINCE THE DATE HEREOF.

AMENDMENTS TO THE PLAN THAT DO NOT MATERIALLY AND/OR ADVERSELY CHANGE THE TREATMENT OF CLASSES MAY BE MADE TO THE PLAN PRIOR TO CONFIRMATION. SUCH AMENDMENTS MAY BE APPROVED BY THE COURT AT THE CONFIRMATION HEARING WITHOUT ENTITLING MEMBERS OF ANY CLASSES WHOSE TREATMENT IS NOT ADVERSELY CHANGED TO WITHDRAW ANY VOTES TO ACCEPT OR REJECT THE PLAN.

THE COURT HAS APPROVED THIS DISCLOSURE STATEMENT BY ORDER DATED JUNE __, 2013 AS CONTAINING ADEQUATE INFORMATION UNDER THE PARTICULAR CIRCUMSTANCES OF THIS CASE. APPROVAL OF THE DISCLOSURE STATEMENT, HOWEVER, IS NOT TO BE CONSTRUED AS AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT. CONFIRMATION OF THE PLAN BY THE BANKRUPTCY COURT WILL BE CONSIDERED AT A HEARING TO BE SCHEDULED ON THE PLAN. CREDITORS ARE URGED TO CONSULT WITH EACH OTHER AND THEIR COUNSEL REGARDING THE PLAN. Accompanying this Disclosure Statement are copies of the following documents (**Exhibits A, B, C and D):**

    **A.**     **The Plan;**
    **B.**     **Current Valuation of the Debtor's Real Property;**
    **C.**     **Plan Confirmation Loan LOI; and**
    **D.**     **Projections.**

## II. <u>BACKGROUND OF THE CASE</u>

**A.**     **Historical Background of the Debtor**

<u>History of the Debtor</u>

The Debtor was incorporated in 2007 in the State of New York. It was founded by Lee Moncho, who is the sole shareholder, for the single purpose of acquiring two townhouses, demolishing them, and constructing a new medical office building on the Upper East Side of Manhattan.

<u>History of Acquisition</u>

261 and 263 East 78th Street, New York, NY (the "Property")  were two side by side 14foot wide townhouses. Lee Moncho acquired 261 East 78th Street for a total cost of $3,537,968 including the purchase price of $3,350,000 in June 2006. This was funded with owner's cash and the proceeds of a mortgage loan of $2,503,242.63. 263 East 78th Street was acquired for a purchase price of $3,500,000.

A combination of the lack of available medical office space on the Upper East Side, the proximity of several hospitals and the amount of work required to renovate the existing townhouses made the best use of the available land and buildable square feet, a new, ground up, medical office building. Lee Moncho engaged a commercial mortgage broker who secured a $10 million construction loan from Broadway Bank ("Broadway"), a small community Bank in

Chicago. $586,026 was added in soft costs in cash by Lee Moncho, which included among other things, architectural services, surveys, zoning analysis and pre-construction services.

In April 2007, the $10 million construction and acquisition loan was closed with Broadway. The loan paid off the outstanding note on 261 East 78th Street, acquired 263 East 78th Street for a purchase price of $3,500,000 and created a hard cost construction reserve of $3,800,000. In addition to other closing costs, an interest reserve fund was created to fund the interest payments for one year.

In addition to the $10,000,000 construction loan, an additional loan was obtained from Hermes Capital LLC ("Hermes"). Hermes is owned by the same family who owned Broadway and was operated from the same offices as Broadway. Originally, an $11,000,000 loan had been sought, and at Broadway's suggestion, the loan was split into a $10,000,000 first mortgage with Broadway and a $1,000,000 second mortgage with Hermes. The second mortgage was secured by the property, not by the stock of the debtor corporation.

<u>Construction of the Building</u>

A series of design flaws and delays in submitting plans to the Building Department meant that demolition could not commence until much later than anticipated. Demolition began in July 2007 and was completed by August 2007. Due to design flaws, the plans had to be amended several times. This included completely changing the elevator system and changing the foundation system twice. Each change resulted in delays to the new building permit being issued by the Building Department. The new building permit was not issued until July 2008. While the new building permit was not issued until July 2008, there were demolition and foundation permits issued prior to that, so at least some work could be done, but there was a lot of time

6

wasted.(the Debtor is suing the architect, but the delays proved to be very disruptive). The numerous design changes also increased the budget substantially.

Once the New Building Permit was issued, construction proceeded well, but there were further design flaws that required changes that caused further delays and expense. Notably, there were changes to among other things, the foundation walls, to the waterproofing, to the fire pumps required, to stand pipes and to the HVAC systems. These changes all came after the permit had been issued, and each change stalled the construction process. However, by June of 2009, the core and shell was very near completion. Leasing had commenced and plans were being made to build out tenant spaces. A new Architect was hired to design the Tenant spaces. A few last items were required in the tenant spaces that completed the core and shell.

Leases were signed by tenants, plans were drawn up and approved by the tenants and the Building Department. Broadway was to approve the tenant improvements and the funding of those improvements to the general contractor. Broadway, however,  failed to approve those leases or the tenant improvements for three separate leases that resulted in long delays. In April of 2010, Broadway finally approved the leases and the funding of the tenant improvements shortly before they failed and were taken over by the FDIC.

Once Broadway had failed and MB Financial Bank, N.A. ("MB") had taken over Broadway and the loan, in the ten weeks between MB taking over at the end of April 2010, and the maturity of the loan at the end of June 2010, the core and shell were completed with one tenant space completed and the two others partially completed.

Due to MB wrongfully declaring a loan default and starting foreclosure proceedings, funding stopped. However, based on the guarantees given by MB and the establishment of an

escrow account specifically to pay the general contractor, the contractor continued to build out the tenant spaces and completed the two remaining spaces by the end of August 2010.

Immediately upon maturity of the loan, notwithstanding the wrongful default, MB applied for the emergency appointment of a receiver. This resulted in the agreed upon appointment of a Temporary Project Manager. The purpose of the Temporary Project Manager ("TPM") was to oversee the finishing of the tenant improvements and to finish construction of the core and shell.

Finishing construction of the core and shell consisted of little more than finishing the installation of the boiler which had been delayed by lack of funding, and connecting the gas. The TPM estimated that all of the work including the administrative costs of getting the temporary certificate of occupancy ("TCO") should have cost $35,000 and taken 6-8 weeks to obtain. MB moved the first tenant into the building July 01, 2010. That was the day after loan maturity, notwithstanding the wrongful default, and while the foreclosure had already been planned and started. Between the date that MB attempted to appoint a receiver, which resulted in the appointment of a TPM in July of 2010, and December 6, 2011 when the Debtor filed for Chapter 11 protection, MB had managed to increase the loan balance by $6,068,593 while still not managing to get a TCO! This included payments to the TPM of over $466,000. Once the Debtor filed for Chapter 11 and came into possession of the Property once again, the receiver, The TPM and the building manager were all let go in January 2012, and the Debtor immediately completed the process of getting a TCO which was finally issued in early April 2012. Since that time, the Debtor has completed several repairs to the base building, executed several service and maintenance agreements, installed signage and installed security and access control systems. It

8

also leased a previously empty floor and supervised the build out of that floor by the tenant. It also leased out the lower level of the building and is currently building that space out from existing cash flow. That space is expected to be complete in May 2013 and is expected to generate an additional $4,500 per month in income upon occupancy as per the lease. There are still two empty floors awaiting leasing. They will be built out to suit tenant requirements as soon as leases are confirmed.

History of the Broadway Loan

Despite the delays and cost overruns, the demand for medical office space remained high and Broadway was initially cooperative. It was in everybody's best interest to persevere and complete the project. The initial $10 million construction loan and $1 million Hermes loan were one year loans and matured in April 2008. Due to the delays from the architectural problems, by the first maturity date, the site was still a hole in the ground, and there was still no new building permit. Broadway made a series of short loan extensions and by June 2009, the core and shell of the building was almost complete.

Due to the financial collapse in 2008 and specifically due to the fact that banks did not want to lend to doctors as they previously had, prospective tenants could no longer borrow effectively to build out their spaces. The market changed, and it became necessary to provide a work letter and to provide custom built spaces to new tenants.

In June 2009, Broadway agreed to extend the loan for one year to June 30, 2010 and to add funds to provide tenant improvements and to fund the interest payments on the loan until maturity. Approximately $1.5 million was added to the loan to fund tenant improvements, and approximately $1 million was added to fund interest reserves and other closing costs.

9

Despite the economic landscape, and due in part to the ability to offer custom built out spaces, the Debtor was fortunately able to achieve above market rents due to the location and use of the building. As rents were plummeting in every other location and sector, rents were secured as budgeted in 2006-7 or even above. The funding of the Tenant improvements was conditional upon leasing, and leases were quickly secured. However, Broadway bank failed to approve funding or to approve leases in a timely manner.

The new loan in 2009 also included an extension agreement. The extension agreement provided for a 3 year extension to the loan from July 2010 to July 2013. This was an option to extend the loan in the event that the lending landscape had not improved by the time of maturity.

However, funding on the tenant improvements came to an abrupt halt in late 2009. In January of 2010, Broadway entered into a consent order with the FDIC and the Illinois Division of Banking. On April 23, 2010 Broadway failed and was taken over by the FDIC who subsequently sold all its deposits and most of its assets to MB.

Valuation of the Property.

The valuation of the majority of income producing buildings is a function of Net Operating income (NOI). That factor changes due to multiple situations such as lease length and maturities, if leases are below or above market rent, interest rates and many other reasons. As the market changes so does the multiple of NOI to establish value, but it is NOI that drives all valuation equations.

When the project was started in 2007, an appraisal and projection were completed by Cushman & Wakefield ("C&W"). That projection forecast rents, operating expenses and taxes

and came up with a projected value of $18 million. C&W Forecast $1,264,488 in Annual

Effective Gross Revenue, $95,000 in Annual Operating Costs and $150,000 in Real Estate Taxes

resulting in a forecast annual NOI of $1,019,488. This resulted in a forecast value of $17,730,226

based on a CAP rate of 5.75% which was rounded up to $18,000,000.

Based on the current rental levels achieved, with the two empty floors conservatively pro

forma as per the occupied floors, Gross revenue would be $1,224,000 with Effective Gross

Revenue being $1,162,800. If one applied the same Operating Expenses, Taxes and CAP Rate,

the Property would have a value of $15,962,000. However, due to the negligence of the receiver

(and bad faith conduct of MB), the annual real estate taxes are not $150,000 as projected but

instead are $323,000 for 2012/3. This means that an extra $173,000 is taken off of the Net

Operating Income. At a 5.75% CAP rate that decreases the valuation by over $3,000,000. The

taxes alone reduce the value of the building to below $13,000,000.

MB Financial had Cushman and Wakefield do another appraisal in June 2010.

That survey used, in essence, the same figures as the initial projection, except the income

projections had been cut to actual income, but the operating income and taxes had been left

alone. However, now an 8% CAP rate was used. The difference between a 5.75% CAP rate and

an 8% CAP rate reduces the value from $15,962,000 to $11,500,000 and that did not even factor

in the new taxes. Current taxes in that valuation model establish a stabilized value of below

$9,300,000. However, the building is not fully leased and is not stabilized and requires tenant

improvements for at least 2 additional floors. **The Debtor therefore believes that the current**

**fair market value as of today is approximately $8,500,000.**

11

Status of Tenancies.

Current tenancies are in monthly rent as follows:

6/F - $21,606
5/F - $17,500 (Net effective $11,000 + short term lease expires on 4/30/13)
2/F - $17,500
1/F - $8,531
L/L - $4,500
3/F - Vacant
4/F - Vacant

Total Monthly Rent - $63,137          Annualized -        $757,644

Current Monthly Expenses - $8,000     Annualized -        $96,000

                                      RE Taxes -          $321,387

                                      NOI                 $340,257

Funding Need for Remaining Tenant improvements/Build Outs

There is currently a lot of interest in the two empty floors, including a written offer from a Hospital, but due to the fact that any medical tenant would be contributing heavily to a build out in addition to the work letter, most prospective tenants are waiting to see the outcome of the Debtor's Chapter 11 case. To build out a floor costs $300,000-$350,000 per floor including architectural, engineering and filing fees and costs.

The fifth floor has been built out to a very high standard by the current short term tenant who is a high end condominium developer for use as a sales model. While a new tenant for the 5th floor would require some modifications, it would not need to be built out from scratch. A tenant improvement package for the 5th Floor would only be in the region of $100,000.

The lower level build out is currently being paid for from existing cash flow. There is approximately $150,000 left to pay, which Debtor expects to be able to pay over the next 4-5 months.

With a $1,000,000 loan, the Debtor can build out the two empty floors, modify the 5th floor, pay for the basement build out and pay the leasing commissions for the new tenants for three floors. The excessive real estate taxes have now been protested, and the tax certiorari legal fees would be paid from savings.

With $1,000,000 in additional financing, the projected rent roll would be:

6/F - $21,606
5/F - $17,500
2/F - $17,500
1/F - $8,531
L/L - $4,500
3/F - $17,000
4/F - $17,000

| | | |
|---|---|---|
| Total Monthly Rent - $103,637 | Annualized - | $1,243,644 |
| Current Monthly Expenses - $8,000 | Annualized - | $96,000 |
| | RE Taxes - | $221,000 |
| | NOI | $926,644 |

The $1,000,000 loan could easily be paid back in less than two years from net income.

<u>Legal Disputes with MB.</u>

1)   <u>The Debtor's Lender Liability Action Against MB</u>

In June 2009, Broadway agreed to extend the term of the loan and to add funds to enable the tenant improvements required. The disbursement of these funds was conditional on leasing. There was also a provision for an extension agreement in the event that the Debtor could not find

13

financing to refinance the construction loan due to the lending landscape at the time. The extension agreement had certain benchmarks that had to be met to be extended, which were in essence that there should be enough leasing income to cover debt service. That loan closed in September 2009.

Almost immediately, the Debtor secured three leases and began the process of preparing the plans to perform the landlord's work to enable the tenants to occupy. Those three leases alone would have satisfied the conditions to exercise the extension agreement. However, it became clear that new management at Broadway did not want the Debtor to complete the project and did not want the Debtor to meet the conditions to extend the loan as per the loan agreement. The new Broadway personnel immediately started to cause delays in funding to the Builder and started negatively interfering in the Debtor's relationship with same.

Between the time the new Broadway personnel arrived at the bank in June 2009 and the time when the loan closed in September 2009, the general contractor ("GC") was already two or three pay applications behind. The very first thing that happened after the loan closed in September 2009 was that Broadway refused to fund the GC as per the loan agreement in an apparent effort to further delay construction. Instead, Broadway paid the GC only 75% of what it was then owed and told the GC that it would be paid the balance over the next 9 months. This was completely unacceptable, and the results were completely predictable, a crippling delay in the completion of the construction. However, in an ironic twist, Broadway inadvertently paid this amount to the GC twice! Broadway then wanted the return of the double payment so that they could tell the GC again that he was not being paid in full.

14

When the GC refused to send back what Broadway was demanding, but offered to send back the balance after it had been paid as agreed, Broadway threatened everybody, called the loan in default and promised to hold the Debtor's principal, Lee Moncho, personally liable for the overpayment even though it had sent it to the GC directly. This incident consequentially irreparably soured the Debtor's relationship with the contractor, which relationship was critical in light of the prior failings of the previous architect and engineers.

Due to design flaws, the foundation system had to be changed twice. It was the GC that finally got the right system for the building and solved the numerous problems that came up. Although over budget and behind schedule, both of those situations would have been far worse without the cooperation of the GC. The souring of that relationship had far reaching effects on the Debtor.

While the Debtor had leases that needed approving in late 2009, the most critical step was getting the plans approved by Broadway to build out the tenant spaces, and the funds approved to pay for that, even though they were in construction reserves with Broadway specifically designated for that purpose. Broadway however would not approve the plans and would not give the contractor the go ahead, even though it was now dealing directly with the contractor.

While the tenants were anxiously pressing to see how their spaces had come along, their spaces sat empty with no work being done as the contractor sat and waited for funds and approvals from Broadway. The project had come to a standstill due entirely to lack of approvals and lack of funding despite the fact the funds were there and the plans had been approved by Broadway's own construction consultants. Approvals were being withheld capriciously or, worse, intentionally.

15

In January of 2010, Broadway entered into a consent order with the FDIC and the Illinois

Banking Division. It appeared that this was a sudden development, but in fact the consent order

had been in place since April 2009. The consent order directed Broadway to raise an ever

increasing amount of money to replenish capital and loss reserves or face closure.

Simultaneously, the Illinois State Treasurer and Broadway Bank's CEO's brother, Alexi

Giannoulias, was running for the Senate seat vacated by President Obama.

The combination of an election run and the imminent failure of Broadway, which was owned by

the Giannoulias Family, resulted in a media frenzy.

Every week there was a new scandal over Broadway's alleged links to organized crime,

political links to scandal ridden politicians and Governors and their shady loan dealings including

dealings with Ponzi schemes and activities to avoid detection by regulators.

What was suspected was that the Giannoulias Family had taken a large dividend roughly equal to

the capital reserve deficiency, and that they could not, or would not, be rescuing Broadway. It

was clear to everybody concerned that Broadway would fail. It was not clear , however, if the

lack of funding to the Debtor's project was due to lack of liquidity on Broadway's part or due to

some other reason.

It seemed very unlikely that anybody would bid on Broadway due to the well documented

problems, and if nobody did bid and Broadway's assets reverted to the FDIC, that did not bode

well for the Debtor's funding crisis and for approving any leases.

It became accepted as fact that Broadway would fail on April 23, 2010. In the run up to

that date, things were becoming increasingly dire. Broadway went "radio silent" with the Debtor,

16

refusing to fund, to approve anything or to answer queries.  All questions were received with

either no answer or a promise that somebody would get back to you, which never happened.

In the last two weeks before Broadway failed, suddenly the personnel at Broadway Bank

became incredibly keen to get the Debtor's project moving again. The contractor reported that

they had been contacted by Broadway who wished to conduct secret appraisals without the

Debtor's knowledge, wanted to guarantee and approve the various projects that had been in

limbo for months and promised payments, deposits and escrow accounts.

None of these things however materialized, and Broadway instead failed, leaving the contractor

with more unfulfilled promises, further souring its relationship with the Debtor.

When Broadway's successor, MB, came on board, the Debtor was initially pleased that

MB had acquired the loan, as opposed to the FDIC, but was concerned that MB had decided to

keep on the same personnel that had such a negative influence at Broadway.

Immediately after Broadway failed, MB, however, refused to honor any of the commitments

previously made, and the GC stopped work and locked the site up.

MB thereafter made some emergency fundings as well as numerous promises to the

contractor including the establishment of an escrow account to pay them in the event there were

open invoices after the maturity of the loan. These promises turned out to be hollow. MB also

made several representations to the Debtor that the loan would be extended, that a deal would be

cut or that some arrangement would be entered into to address the imminent maturity date.

At this stage the former President of Broadway and the person in control of Hermes

Capital, LLC ("Hermes"), the second mortgagee, entered "the fray" trying to make a deal to buy

the note from MB Financial and to enter into some kind of joint venture with the Debtor. This

17

was within a month of Broadway failing.  A deal was proposed to MB that involved the Debtor

paying for all remaining construction, paying for all the tenant improvements, replenishing

interest reserves and paying MB 100 cents on the dollar for the loan. MB refused. It became clear

as the maturity date approached that there was not going to be a deal between MB and Hermes,

and it became even clearer that neither entity had any interest in a deal that protected the Debtor's

interests. However, the Debtor had enough leasing in place to exercise an extension agreement,

and the sole reason those leases had not yet occupied was Broadway and subsequently MB's

refusal to timely approve the build outs or leases.

In June of 2010 the Debtor received a strange series of documents including a default

notice from Broadway even though it had failed some 60 days earlier! It later transpired that MB

had decided while funding other items, to not pay itself from interest reserves, despite having

ample funds in the interest reserve escrow account. The Debtor believes the sole reason for this

was to create or manufacture a default. One of the terms of the extension agreement was that

there was to have been no event of default.

The Debtor had to notify MB 10 days in advance of the June 30, 2010 maturity date if it

wished to exercise its extension agreement. 13 days before the maturity date, on June 17, 2010,

the Debtor was sent a default notice printed on the old Broadway Bank system.

MB continued to represent that a deal was going to be made and kept trying to persuade the

Debtor to waive its Bankruptcy rights, right up until the day before the loan matured. The next

business day after maturity, MB advised the Debtor's attorney that it would be foreclosing and

seeking the emergency appointment of a Receiver.

18

MB thereafter went to Court to make what they believed would be an unopposed motion for a receiver.  The Debtor had predicted this course of action and MB's counsel  was met at the courthouse by attorneys representing the Debtor. The Debtor believes that MB had planned to foreclose and to attempt to appoint a receiver before the loan had matured, and that all the aforementioned negotiations had been conducted in bad faith. The Debtor's attorneys argued that the appointment of a receiver was unnecessary and that MB's representations that the property had been abandoned were patently and knowingly false.

In the next couple of weeks, it was agreed that a Temporary Project Manager ("TPM") would be appointed to carry out the remainder of the work required to complete the construction of the core and shell, in lieu of appointing a receiver.

MB proposed TPM that was not only a client of Broadway and a client of the Giannoulias' other bank in New York, but was also a renowned slumlord with a long history of evicting tenants and incurring hundreds of violations. The Debtor rejected the selection of that TPM as not being suggested in good faith. Eventually, a new TPM was proposed, and a stipulated agreement was entered into which in essence provided that MB would pay the TPM to complete construction and obtain a TCO. Almost immediately after the agreement was court ordered, MB started arguing that the clear language of the agreement said something different and that instead of being required to complete construction and get the TCO, what the agreement said was that the TPM would spend the next two months evaluating what was needed to get a TCO.

The first thing the TPM did was refuse to pay the doorman and instead appointed a security guard and instructed him to wrongfully deny access to the contractor, any of the subcontractors or the Debtor. The subcontractors were not allowed to even get their tools, and the tenants who had not been in for as much as a month reported that their staff and clients felt threatened and uncomfortable with this level and type of security.

Shortly after the stipulated agreement, MB made a motion to appoint a Receiver before any work had been done. At that hearing, MB stated that the TPM had come to the conclusion that there was roughly $35,000 worth of work to be completed and that a TCO would take 6-8 weeks to obtain. By this time, it was already 8 weeks since the TPM was appointed and MB had already paid him more than $35,000 to come to the conclusion that there was $35,000 of work remaining! All these costs were being added to the loan balance.

Everybody, including the TPM, agreed that the best and cheapest way to get this done was to pay Central Consulting & Contracting , Inc. the GC. The TPM recommended to MB that was the most cost effective way forward.

The Debtor was becoming increasingly suspicious that MB's only objective was to delay the process of getting a TCO, run up the costs and to prevent the Debtor from selling or refinancing the project. To that end, a Receiver was appointed in September of 2010. The Judge at the time stated clearly that he felt that MB was using the appointment of a Receiver as a weapon, that its claims were monetary in nature, and ordered MB to post a bond equal to the value of the building. MB argued that the value of the building was $8 million, and they were ordered to post a bond in that amount.

MB argued ferociously that the bond was not required, and that as they were a publically traded Bank, that meeting their obligations was not a concern. They threatened to make a motion to re-argue and to ask for a reconsideration. They eventually persuaded the Judge to allow them to just post a $350,000 receiver's bond. Allowing MB to not post the bond as ordered caused the Debtor irreparable damage.

Despite the TPM's claims that a TCO was $35,000 and 6-8 weeks away, MB went on a campaign to evict the tenants or make them leave, and to run up costs and expenses while devaluing the building.

Between the date that MB attempted to appoint a receiver in July of 2010 and December 6, 2011 when the Debtor filed for Chapter 11 protection, MB had managed to increase the loan balance by $6,068,593 while still not managing to get a TCO. MB also refused to approve two leases which the Debtor had in hand shortly before maturity.

The Receivership

MB filed motion after motion and engaged in legal tactics that cost the Debtor significant legal fees to defend and took a lot of time to resolve, all the while applying default interest and legal fees to the loan balance. Despite the fact that the TPM had recommended paying the existing contractor to complete the very small amount of work remaining, MB had the Receiver supersede the appointment of a General Contractor, and the appointment of the subcontractors.

The TPM who was now the new GC with new subcontractors, instead of applying for new permits, allegedly decided to fraudulently post copies of fake permits or permits issued to the previous contractors for unrelated work. They failed to realize that the Debtor's GC had withdrawn and that in fact there was a Stop Work Order on the building. This caused an

avalanche of violations, fines and situations that required time and money to defend and resolve.

The TPM was advised over and over again that he needed to supply a simple affidavit to the

NYFD in order to get the Fire Alarm inspection signed off.  The inspection had already been

approved by Broadway and the inspection had taken place. The inspection had been passed

conditional on a few simple matters.

When those matters had been complied with, a simple affidavit attesting to such matters

as an additional exit sign would suffice. However, there was a deadline to comply, and if that

deadline was missed then a whole new inspection was required. However, the TPM did not

comply, the inspection expired and the TPM had to start all over again. The Fire Alarm

inspection is critical because without it there cannot be a gas connection and resulting boiler

inspection approval. Without a boiler inspection, one cannot have heat or hot water.

There were numerous instances of the TPM allegedly and purposely delaying the project

and of the Receiver refusing to pay utilities or for maintenance, but the primary damages caused

by the Receiver and TPM concern the elevators and the filing of income and expense reports for

the calculation of assessed values and Real Estate taxes for the Property.

When the loan matured in June 2010, MB Financial believed that they would be

unopposed and that they would be allowed to foreclose on the Property at will. As a result, MB

wanted to maximize the value of the building, and that meant leasing. MB moved the first tenant

into the building on July 1, 2010 and as per MB's representations that it would secure a TCO

within 8 weeks the Debtor moved two additional tenants in at the end of August 2010.

When MB realized that they would not be able to take the building unopposed, they then

allegedly decided to minimize the value of the building and maximize the balance of the loan and

22

that meant emptying the building, or at least minimizing the income. The three tenants in the

building had clauses in their leases that said they did not commence paying rent until there was a

TCO in place.  If MB ensured that there was no TCO, then there would be no income, and

without income the value of the building would plummet, especially as the building fell into

disrepair. The TPM's willful failure to have the fire alarm system signed off resulted in no heat

or hot water as the winter of 2010 approached.

One of the tenants was an OB/GYN who was left without hot water or permanent heat.

The Debtor believed that MB was laying siege to the building and making conditions intolerable

and illegal for the tenants. Meanwhile, the violations were skyrocketing.

Trash was not being collected because the Receiver was not paying the garbage contractor (which

was a mere $81 per month) and there were insect infestations due to the trash accumulating in the

basement. The elevator was not maintained and needed repair after damage resulting from

construction being stopped. The Receiver refused to repair or maintain the elevator despite

numerous dangerous incidents where people were trapped in the elevators, or the elevators

jumped and seized due to the fact that they had not been serviced. When people were trapped in

the elevator, they could not call for help due to the fact that the Receiver had not paid the

telephone company and the life and safety telephone lines had been disconnected.

All the while, MB was directly paying the Receiver a monthly fee that is expressly

forbidden as a Receiver is supposed to be impartial and paid only from the commissions on

income and expenses. Despite being paid a fee, the Receiver refused to pay for anything claiming

that the Bank refused to fund her.

There was now substantial permanent damage to the elevator system. When the Debtor finally regained control of the building, elevator repairs were $60,000. This is for a brand new elevator system. Motors had to be replaced because lack of oil in the hydraulics had caused the motors to seize. Sheaves had to be replaced, oil tank heaters had to be installed and there was a whole host of other problems.

The sixth floor tenant was so afraid of the elevators that they invariably used the stairs and they are an eating disorder clinic where their patients may not always be in physical condition to use the stairs. The elevator company wrote to the Receiver advising her that they were no longer responsible or liable as the maintenance was not being carried out.  Multiple Complaints were filed with the Building Department. People were being trapped for long periods. Lives were being endangered and public safety was compromised. When the tenants complained about this to the TPM or the Receiver, the response was the same "What do you expect if you are not paying rent?" Meanwhile, the TPM was billing and getting paid every month and so was the Receiver.

This course of conduct was also ruining the Debtor's relationship with its tenants. Meanwhile, the Receiver, while doing absolutely nothing despite being paid a fee, was harassing the tenants to pay rent despite their lease clauses stating that rent would commence with a TCO, or in one instance upon substantial completion.

The Receiver argued that despite no heat, no hot water, no elevator service and insect infestations with garbage mounting up in the basement, that the building was complete and that if the tenants did not pay rent she would evict them and seek a judgment for back rent.

24

The Receiver made a motion to appoint an Attorney to evict the tenants despite the fact that she was supposedly an Attorney herself. Every action that MB took was now being triple billed at attorney rates- MB's attorney, the Receiver and now the Receiver's Attorney.

Part of the order appointing the Receiver clearly states that she was directed and authorized to compel MB to comply with the stipulated agreement to complete construction and get a TCO. If she had done that, the tenants would have gladly started paying rent and she would have been making a Receiver's commission on all rents received. She would also have been serving the very purpose of her appointment.

However, the most damaging thing the Receiver did from a financial point of view was her failure to act with regard to filing an income and expense report for the building and her failure to protest the uncontested real estate taxes being assessed on the Property. The Debtor requested the Receiver by email and by registered mail to file the real estate tax income and expense reports and to protest the taxes, an essential thing to do when there is a newly constructed building. The Debtor told the Receiver that it had retained a tax certiorari law firm on contingency and that at no cost to MB or to herself, all she had to do was supply the information and authorize a protest of the taxes. The Debtor reminded the Receiver multiple times as the deadline neared. She failed to act, allegedly due to MB telling her to not file or protest the real estate taxes. The real estate taxes were extraordinarily high at the time due to the fact they had not been protested as follows:

Tax Year 2009/10 - $58,426
Tax Year 2010/11 - $206,442
Tax Year 2011/12 - $233,109
Tax Year 2012/13 - $318,173

The real taxes should only currently be about $100,000 per year. For 2013 they are approximately

$318,173. Not only is that an unreasonably high number, it literally swallows up all the cash

flow, and any increases will now not be transitioned in from a lower base. The most drastic effect

though is that the real estate taxes directly reduce the net operating income ("NOI") of the

building, and the value of the building is usually calculated as a multiple of NOI. At a 6% CAP

rate, those taxes alone devalue the building by $4,333,000!

<u>Events Resulting In The Bankruptcy</u>

During the State Court foreclosure proceedings, it became obvious that there were some

inconsistencies in the assignment of mortgages and notes. The Debtor already alleged that there

had been a wrongful default, and as such, that the foreclosure was premature, but it was also

discovered that the Broadway mortgages had been assigned to MB 10 months after the

foreclosure was commenced. It also appeared that the assignments may have been forged and

there were more questions every day over the documentation that had been submitted to the

Court by MB. MB refused to answer interrogatories and refused to produce key discovery, some

of it to this day. When the State Court Judge ordered MB to answer the interrogatories, MB's

counsel announced that the woman whose discovery had not been produced, and was supposed to

be answering the interrogatories had unexpectedly left the bank, effective that morning. That

afternoon, MB filed a motion for summary judgment.

When the interrogatories were eventually answered, it became clear to the Debtor that *MB did not possess the original Broadway notes.* It appeared that MB had never possessed the original notes and really had no explanation for either not having the notes or for having lost the notes.

Meanwhile, through the media and through the examination of documents on ACRIS, it appeared that MB's situation was not isolated to the Debtor's case. There were several other loans that MB had acquired from Broadway which had similar lacking elements.

The fact that the Debtor believed MB was doing everything to take the Property, combined with the fact that the building was being destroyed in front of the Debtor's eyes, forced the Debtor to file Chapter 11.

The Debtor was fearful that somebody was going to get hurt or killed in the elevators. The elevators were being neglected, the Receiver was ignoring regular safety incidents, people were getting trapped and there were some very scary incidents of violent lurching.

One week after the Debtor filed for Chapter 11 protection on December 6, 2011 and took control of the building, an elevator accident on Madison Avenue claimed the life of a woman. That elevator had a simple safety measure left off during a break, and the results were catastrophic. Their elevators were in far better shape and far better maintained and serviced than the Debtor's.

MB had allowed the liability insurance to lapse, the Receiver refused to pay anybody and the elevator company had declared that they were not liable and instructed the Receiver to close down the elevators as they were a public safety danger. The Receiver refused to do even that.

27

After filing for Chapter 11 on December 6, 2011, the Debtor informed the Receiver that she was discharged of her duties and got the elevator company in immediately to secure the elevators and figure out how to get them back into safe, working order. Inexplicably, the Receiver refused to turnover possession of the building and told the security guard to remain and deny the Debtor access.

This was quickly resolved, as the Bankruptcy Court ruled in January, 2012 that the Receiver was to turnover possession of the building to the Debtor, denying MB's motion to dismiss the Chapter 11 case and excuse compliance with turnover of the building from the Receiver.

Once the Debtor regained control of the building, it entered into rent commencement agreements with the tenants and immediately set about repairing the damages caused and getting the TCO that MB had still not secured.

At the onset of the Chapter 11 Case, as set forth above, MB immediately filed motions to dismiss the Chapter 11 case, lift the automatic stay and keep the Receiver in place. This was accompanied by their opposition to allow the debtor to use the Cash Collateral to make critical repairs including among other things, the elevators. MB's motion was summarily denied.

The Chapter 11 case progressed, and while MB resisted every action, the Debtor was allowed to make the building safe, complete the repairs, install the items that MB had not done and to bring the building back to somewhere near its potential. The tenants agreed to commence paying rent, and the Debtor obtained the TCO in the Spring of 2012.

Even though the estate had some income with which to perform the repairs, the estate was still crippled by the excessive real estate taxes. These taxes and the new escalated taxes due in

28

July 2012 were absorbing all the Debtor's cash flow. In addition there were all the violations and

fines incurred by the TPM which had not been paid.

In one instance, a violation could not be argued because the Receiver and her Attorney

had appeared at the ECB so many times to have the violation adjourned that it had been marked

final. That violation cost $2,500 as well as many appearance fees.

However, the Debtor managed to pay the real estate taxes and perform the repairs. The

Debtor established garbage removal, paid the utilities, repaired the elevators, performed all the

inspections required, cleared the violations, put in a superintendent/building manager and

installed the security systems and access control systems. The Debtor signed a lease for the lower

level and managed to sign a short term lease for an empty floor to a condominium project on the

same block that needed a sales office. The condominium project agreed to do their own build out

for a reduced rent and to even provide a doorman for the building.

The Debtor could not use its previous GC to build out the lower level tenant space since

he was a creditor with a filed mechanic's lien, and as much as he was sympathetic to the debtor's

plight, had still not been paid over $1,000,000 in outstanding charges.

He had not even been paid, at the time, the money that MB was holding in escrow that he should

have been paid 18 months earlier. The Debtor was forced to find another contractor and

managed to negotiate terms with them where the Debtor could pay them over time out of

available cash flow.

MB still refused to disburse the remaining funds in the hard cost reserves account and

refused to allow the Debtor to get DIP financing to finish tenant build outs and improvements.

The Debtor was paying for the lower level improvements from existing cash flow, but MB's

position on DIP Financing and undisbursed funds meant that the two remaining unimproved

floors could not be finished and leased out.

The permit for the lower level should have been a routine matter, but MB had paid the

core and shell Architect for an inspection sign off to get the building to the point where it could

get a TCO when that was required. However, MB failed to recognize that the Architect had made

yet another mistake and had mislabeled the lower level office space as storage space. As part of

MB's payment to the Architect, which they put onto the Debtor's loan balance, they should have

insisted that the Architect rectify his mistake.

The Architect refused to sign a simple application for a change of use because he was

being sued by the Debtor and was looking for a complete waiver in exchange for a change of use

form. As a result of this, the permit, which should have taken a matter of days, was not issued for

over a year!

Instead of starting construction on the lower level in March of 2012, the permit was not

issued until February, 2013. Apart from the loss of income, the interference with tenant

relationship and with his business had a negative effect on the Debtor.

Despite all these setbacks and obstacles, today, the Debtor has a building that is safe,

compliant with all applicable laws and regulations, with performing tenants and with very high

levels of interest in leasing the remaining two floors. It has written offers for the remaining

floors, but those prospective tenants are waiting to see the outcome of the bankruptcy, as in many

cases the lease requires heavy investment by the tenant in tenant improvements. The leases are

therefore sidelined until the Chapter 11 case can be resolved.

<u>The Debtor's Objection to MB's Standing</u>

The first issue that arose in the Bankruptcy was MB's standing to assert a claim against the Debtor. MB has admitted that it does not possesses the original notes[2]. Without possession or legal ownership of the note, MB has no standing to assert a claim, secured, unsecured or otherwise, against the Debtor or its estate under well settled principles of New York statutory and case law. The Debtor accordingly filed an adversary proceeding under Adv. Pro. No. 12-01118 (the "Standing Lawsuit") seeking a determination and/or declaration from the Bankruptcy Court that MB neither has standing nor a claim against the Debtor or its estate.

Discovery ensued, and when the Debtor deposed the staff of MB and the former staff of Broadway, it appeared that the notes had not even been in Broadway's possession at the time they failed.  In the depositions, a document was produced that listed the collateral files held by Broadway 34 days before it failed. However, in MB's motion for Summary Judgment, it attached the list of collateral files held by Broadway as an exhibit. That document suggests that there were approximately 50 loans that were allegedly assigned  to MB by the FDIC for which Broadway did not even hold a collateral file. That does not include loans such as the Debtor's, where there was a Collateral File *but with no original notes inside*.

---

2 The Debtor believes that the notes may have been secretly assigned by Broadway to a third party *prior to* the bank's collapse, and , therefore, MB could not possibly possess or own the notes.

31

The Bankruptcy Court came to the conclusion that MB could have standing despite the fact it did not have the original notes or a credible lost note affidavit from someone with personal knowledge.  Accordingly, on December 10, 2012, the Bankruptcy Court ruled that MB would only have standing as a creditor in the Chapter 11 case conditioned upon posting a bond or other financial equivalent, including a stand by letter of credit, in the amount of $35,349,654.56 (the "Bond"), that being twice the amount of MB's claim filed in the Chapter 11 Case. To date, MB has failed to post the Bond, and the Debtor will now seek an order of the Bankruptcy Court denying MB's summary judgment motion and instead granting the Debtor's motion voiding and disallowing MB's standing and claims in the Chapter 11 case for failure to post the Bond.

The Debtor's Lender Liability Action Against MB

On June 30, 2010 when the Broadway loan was due to mature, the Debtor had already arranged to have 3 tenants in place with completed build outs and 2 additional tenants with leases signed and ready to occupy completed built out spaces. However, as set forth in the Debtor's Adversary Proceeding No. 13-01000 (the "Lender Liability Action") and as described at length above, MB's intentional bad acts and conduct caused the Debtor significant consequential and punitive damages as follows:

32

A.   Damages Related to Loss of Rents:

- Mando Eating Disorder Clinics agreed to lease in July, 2009 – They should have moved in on January 1, 2010, which meant by June 30, 2010 the Debtor should have had $114,000 cash in rent on hand and additional $19,000 per month going forward.

- Amplitude agreed to lease in August, 2009 – they should have also moved in on January 1, 2010, which meant by June 30, 2010 the Debtor should have had $105,000 cash in rent on hand and additional $17,500 per month going forward.

- Dr. Michel agreed to lease in November, 2009  - she should have moved in on April 1, 2010, which meant by June 30, 2010 the Debtor should have had $16,000 cash in rent on hand and an additional $8,000 per month going forward.

- There should also have been approximately $50,000 in extras and upgrades which were provided by the Debtor. These were to be paid for, but were not collected from the Tenants as the Debtor had to give incentives to not walk on their leases due to the delays caused by MB and the Receiver.

- Lenox Hill Physical Therapy agreed to lease in April, 2010 – they should have moved in on July 1, 2010. Their rent was $4,500 per month.

- Dr. Davidowitz agreed to lease in June 2010 – his lease was set to start July 1, 2010 with a Landlord cash contribution of $200,000 - His rent was $17,500 per month.

Therefore, by June 30, 2010, the Debtor should have already had $285,000 on hand, holding $116,000 in deposits and $66,500 per month in income going forward.

By the time the Debtor filed for Chapter 11 in December  2011, it should have already collected $1,500,000 in rent and additional rent items,  should have had $116,000 in security

deposits on hand and should have further collected undetermined tax escalations. These damages total $1,616,000.

B.   Damages Related to Increased Amounts owed General Contractor and Others.

On June 30, 2010, the Debtor should have only owed Central, the General Contractor  $607,000. Due to the delay and damages caused by MB, the Debtor owed Central $1,035,584 as of the Petition Date. These damages total $428,584.

As a direct result of MB's delay and other bad acts as set forth in detail above, the Debtor had to incur the following additional expenses; the Engineer - $10,000; the Architect  -$20,000; the Security Company - $35,000; $95,000 in Repairs; $29,000 in Security Systems; $8,000 in signage. In addition, the Debtor should have still had use of $280,000 left in hard cost reserves with MB. These damages total $477,000.

C.   Damages Related To Incurring of Legal Fees.

As a result of MB's bad faith conduct and litigation tactics, the Debtor has incurred no less than $1,280,000 in legal fees in litigation with MB. These damages total $1,280,000

D.   Damages Related to Real Estate Taxes.

The Debtor believes that due to the willful and intentional delays and inactivity orchestrated by MB the Debtor has incurred and/or overpaid its real estate Taxes by no less than $407,724 through June 30, 2013. On June 30, 2010 it should have only paid $50,000 in taxes, and by June 30 2013 it should have only paid $350,000. In reality, it will have paid $757,724. These damages total $407,724.

E.   Damages Based on Loss of Property Value.

Based on conservative rental estimates and a conservative 7% CAP rate, the building, had

MB not intentionally delayed, interfered and consequentially devalued the building,  would

currently be worth approximately $14,285,714.. Instead, the Property, due to its incomplete and

partially vacant state, directly caused by MB's delays and bad acts, is currently worth only

$8,500,000. These damages total $5,785,714.

F.   Summary of Damages.

Therefore, the total approximate principal damages sought under the Lender Liability

Action is no less than approximately $9,995,022.   With statutory judgment interest thereon at the

rate of 9% from June 2010 (approximately 3 years), this amount increases to approximately

$12,639,677.94.

Giving the benefit of doubt as to the success of each and every of the Debtor's claims

under the Lender Liability Auction The Debtor therefore estimates that MB's maximum Allowed

Claim against the Debtor, assuming it posts the Bond, will be no more than $6,000,000.

**B.      Current Valuation of the Property.** Annexed hereto as Exhibit "B" is a current

valuation of the Property in the reconciled amount of $8,900,000. The Debtor believes that,

based upon the current conditions and occupancy of the Property, the current fair market value of

the Property is $8,500,000. Based upon said valuation, both the Class 2 and Class 3 Secured

Claims, if Allowed,  are fully secured within the meaning of Sections 506(a) of the Bankruptcy

Code.

3.    **The Chapter 11 Case**

On December 6, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for reorganization pursuant to Chapter 11 of the Bankruptcy Code. The Debtor was continued in possession of its property and the management of its business affairs as a Debtor-in-possession pursuant to §§1107 and 1108 of the Bankruptcy Code.

**Employment of the Debtor's Professionals**

On December 20, 2011, the Bankruptcy Court entered an order authorizing the retention and employment of Shaked & Posner as attorneys for the Debtor. The Shaked firm was relieved as counsel to the Debtor and substituted by DelBello Donnellan Weingarten Wise & Wiederkehr, LLP by Order dated January 23, 2013. On March 9, 2012, the Court entered an order authorizing the Debtor to employ Georgoulis & Associates, PLLC as special litigation counsel to the Debtor. On May 2, 2012, the Court entered an order authorizing the Debtor to employ Newhouse & Shey as special real estate counsel. On May 4, 2012, the Court entered an order authorizing the Debtor to employ NRT NY LLC d/b/a Corcoran Group as exclusive leasing agent to the Debtor. On June 12, 2012, the Bankruptcy Court entered an order authorizing the Debtor to retain Marcus & Pollack, L.L.P. as special tax certiorari counsel.

**Filing of Schedules of Assets and Liabilities and Statement of Financial Affairs**

On December 6, 2011 the Debtor filed its Schedules of Assets and Liabilities, together with its Statement of Financial Affairs (collectively, the "Schedules"). The Debtor's Schedules are available on the Bankruptcy Court's website: www.nysb.uscourts.gov.

36

### Establishment of a Claims Bar Date and Claims Process

Pursuant to an order of the Bankruptcy Court dated December 16, 2011 ("Bar Date Order"), February 3, 2012 was established as the last date by which creditors may file proofs of claim in the Chapter 11 Case, except as otherwise provided in the Bar Date Order.

### Post Petition Operations

The Debtor has continued to operate the Property and has paid all post-petition expenses from the Debtor's cash flow.

### Administrative Bar Date

No administrative bar date has yet been set.

## III.  THE PLAN OF REORGANIZATION

THE FOLLOWING IS A BRIEF SUMMARY OF THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TEXT OF THE PLAN, A COPY OF WHICH IS ANNEXED HERETO AS **EXHIBIT "A."** THIS SUMMARY SHOULD NOT BE RELIED ON FOR VOTING PURPOSES.  CREDITORS ARE URGED TO CONSULT WITH THEIR COUNSEL AND WITH EACH OTHER IN ORDER TO FULLY UNDERSTAND THE PLAN AND EXHIBITS ATTACHED TO IT.  THE PLAN IS COMPLEX INASMUCH AS IT REPRESENTS A PROPOSED LEGALLY BINDING AGREEMENT BY THE DEBTOR, AND AN INTELLIGENT JUDGMENT CONCERNING SUCH PLAN CANNOT BE MADE WITHOUT UNDERSTANDING IT.

A.      **General**

In general, a Chapter 11 plan of reorganization must (i) divide Claims and equity interests into separate categories and classes, (ii) specify the treatment that each category and class is to receive under such plan, and (iii) contain other provisions necessary to implement the reorganization of a debtor. A Chapter 11 plan may specify that the legal, equitable, and contractual rights of the holders of Claims or equity interests in certain classes are to remain unchanged by the reorganization effected by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to vote to accept the plan. Accordingly, it is not necessary to solicit votes from holder of Claims in such "unimpaired" classes. Pursuant to Section 1124(1) of the Bankruptcy Code, a class of claims or interests is "impaired," and entitled to vote on a plan, unless the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest."

Under the Plan, Holder of Claims and Interests in Class 1 are "unimpaired," and thus, are deemed to vote to accept the Plan. Holder of Claims and Interests in Classes 2, 3, 4 and 5 are impaired, inasmuch as they will receive a lesser amount on account of their Claims than they would be entitled to under applicable law. A Class is impaired if its legal, contractual or equitable rights are materially altered or reduced.  This means that a creditor or class whose rights are impaired will receive less than they would have received, and at a later date, than they would have in the absence of an insolvency proceeding. Accordingly, holders of Claims in Classes 2, 3 and 4 are entitled to vote. Pursuant to Section 1126 of the Bankruptcy Code, the Plan must be accepted by more than one half in number and two-thirds in amount of at least one class

of impaired creditors of those voting in order for the Plan to be confirmed.

**B.    Classification and Treatment of Claims and Equity Interests**

Section 1122 of the Bankruptcy Code provides that a plan of reorganization shall classify the claims and equity interests of a debtor's creditors and interest holders. In compliance with Section 1122, the Plan divides the holders of Claims and Equity into six categories and four classes, and sets forth the treatment offered to each class.[3] These Classes take into account the differing nature and priority of Claims against the Debtor.

The Plan segregates the various Claims against, and Equity Interests in the Debtor into Unclassified Category 1 General Administrative Expense Claims, Unclassified Category 2 Allowed Professional Fees, Unclassified Category 3 U.S. Trustee's Fees, Unclassified Category 4 Priority Tax Claims, Unclassified Category 5 20-Day Vendor Claims (the Debtor does not believe there are any such claims), Class 1 Non-Tax Priority Claims (the Debtor does not believe there are any such claims), Class 2 and 3 Secured Claims, Class 4 General Unsecured Claims, and Class 5 Equity Interests. The order of distribution as set forth in the Plan and as described below is in accordance with the priorities set forth in the Code and applicable State Law.

| Class | Status |
|---|---|
| Class 1 – Non-Tax Priority Claims | Unimpaired – deemed to accept the Plan, and therefore, not entitled to vote |
| Class 2 – MB Financial Bank, N.A. | Impaired – entitled to vote |

---

[3] A Debtor or other plan proponent is required under Section 1122 of the Bankruptcy Code to classify the claims and interests of its creditors and interest holders into classes containing claims and interests that are substantially similar to the other claims or interests in such class. While the Equity Holders believe that its classification of all Claims and Equity Interests is in compliance with the provisions of Section 1122 of the Bankruptcy Code, it is possible that a holder of a Claim or Equity Interest may challenge the Debtor's classification scheme and the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, it is the present intent of the Debtor, to the extent permitted by the Bankruptcy Court, to modify the Plan to provide for whatever reasonable classification might be required by the Bankruptcy Court for Confirmation.

| | |
|---|---|
| Class 3 – Hermes Capital, LLC | <u>Impaired</u> – entitled to vote |
| Class 4 – General Unsecured Claims | <u>Impaired</u> – entitled to vote |
| Class 5 – Interest holders | <u>Unimpaired</u> – deemed to accept the Plan, and therefore, not entitled to vote |

Set forth below is a summary of the Plan's treatment of the various categories and Classes of Claims and Equity Interests. This summary is qualified in its entirety by the full text of the Plan. In the event of an inconsistency between the Plan and the description contained herein, the terms of the Plan shall govern. The Plan is complicated and substantial. Time should be allowed for its analysis; consultation with a legal and/or financial advisor is recommended and should be considered.

**1. Unclassified Categories of Claims – Administrative Expense Claims and Obligations**

Administrative Expense Claims and Obligations include costs incurred in the operation of the Debtor's business after the Petition Date, the fees and expense of Professionals retained by the Debtor, and any statutory committee appointed to serve in the Chapter 11 cases. Administrative Expense Claims and Obligations are unimpaired under the Plan, and accordingly, such Claimants are deemed to accept the Plan.

(a)    <u>Category 1 – Administrative Expense Claims</u>

General Administrative Expense Claims include claimants who have filed an Administrative Proof of Claim for the actual and necessary costs and expenses incurred during the Chapter 11 case prior to the Administrative Bar Date. Under the Plan, all General Administrative Expense Claims shall be paid in full, in Cash, in such amounts as (a) are Allowed by the Bankruptcy Court upon the later of the Effective Date, (b) the date upon which there is a

40

Final Order allowing such Administrative Expense Claim or any other date specified in such Order, or (c) as may be agreed upon between the holder of such Administrative Expense Claim and the Debtor. The Debtor estimates the Administrative Expense Claims to be $0, as the Debtor's operational expenses are continuously paid in the ordinary course.

(b)    Category 2 –Allowed Professional Fees

All entities seeking an award by the Bankruptcy Court of Professional Fees, or of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under Sections 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code, (a) shall file their respective final applications for allowances of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date within the time proscribed by the Court so that such application can be considered for allowance at the Confirmation Hearing, and (b) if granted, such an award by the Bankruptcy Court shall be paid in full in such amounts as allowed by the Bankruptcy Court (i) on the later of the Effective Date or the date such Administrative Professional Fee Claim becomes Allowed, (ii) upon such other terms as may be mutually agreed upon between such holder of an Allowed Administrative Professional Fee Claim and the Debtor or, on and after the Effective Date, the Reorganized Debtor, or (iii) in accordance with the terms of any applicable administrative procedures order entered by the Bankruptcy Court. All Administrative Professional Fees for services rendered in connection with the Chapter 11 Cases and the Plan after the Confirmation Date, including, without limitation, those relating to the occurrence of the Effective Date and the resolution of Disputed Claims, shall be paid by the Disbursing Agent upon receipt of an invoice therefore, without the need for further Bankruptcy Court authorization

41

or entry of a Final Order. If the Reorganized Debtor and any Professionals cannot agree on the amount of post-Confirmation Date fees and expenses to be paid to such Professionals, such amount shall be determined by the Bankruptcy Court.

Allowed Administrative Professional Fees are anticipated, as of the Confirmation Date, consist of the following:

Shaked & Posner - $10,000

DelBello Donnellan Weingarten, Et Al - $65,000

(c)    <u>Category 3 – United States Trustee's Fees</u>

Under the Plan, all United States Trustee statutory fees arising under 28 U.S.C. § 1930(a)(6) shall be paid in full, in Cash, in such amount as they are incurred in the ordinary course of business by the Debtor. The Debtor shall be responsible, through the entry of a final decree closing the case for the payment of United States Trustee quarterly fees, and pursuant to 31 U.S.C. §3717, any interest assessed on unpaid Chapter 11 quarterly fees charged, assessed at the interest rate in effect as determined by the Treasury Department at the charges become past due, however if payment of the full principal amount is received within thirty (30) days of the date of the notice of initial interest assessment, the interest assessed with be waived. The Debtor estimates unpaid United States Trustee fees through Confirmation to be $0.00.

(d)    <u>Category 5 – Priority Tax Claims</u>

Allowed Priority Tax Claims pursuant to Section 507(a)(8) of the Bankruptcy Code shall be over a period of five (5) years from the date of assessment as allowed by 11 U.S.C. §1129(a)(9)(C) or paid in full in cash on the Effective Date in full and final satisfaction of its claims as against the Debtor and any of its officers and owners. The Debtor estimates the

42

Allowed Priority Tax Claims to be $0.00.

      (e)     Category 6 – 20-Day Vendor Claims

The Debtor does not believe there are any 20-Day Vendor Claims.

    **2.**  **Classified Categories of Claims**

Pursuant to Section 1124 of the Bankruptcy Code, a class of claims or equity interests is impaired unless the legal, equitable, and contractual rights of the holders of Claims or equity interests in such class are not modified or altered. Holders of Allowed Claims and Interest in impaired classes are entitled to vote on a debtor's plan of reorganization. Under the Debtor's Plan, Class 1 is unimpaired and deemed to vote to accept the Plan. Holders of Class 2, 3 and 4 Claims are impaired and entitled to vote on the Plan. Holders of Interests in Class 5 are unimpaired and are deemed to accept the Plan.

Classified Claims

(a)     Class 1: Class 1 consists of all Allowed Non-Tax Priority Claims. The Debtor shall pay to Holders of Class 1 Claims the amount of their Allowed Claim in full and in cash on the Effective Date, in full and final satisfaction of its claims as against the Debtor and any of its officers and owners. Class 1 Claims are not impaired under the Plan, are not entitled to vote on the Plan, and are deemed to accept the Plan. Allowed Class 1 Claims total approximately $0.

(b)     Class 2: Class 2 consists of the Allowed Secured Claim, if any, of MB. MB has filed a Secured proof o Claim in the Chapter 11 Case in the amount of $17,674,827.28, which Claim is wholly disputed by the Debtor. The Plan provides that the Class 2 Claim, if Allowed, is to be treated as follows:

(i)     In the event that MB fails to post a bond in twice the amount of its filed proof of

claim, or $35,349,654.56 (the "Bond"), in accordance with the Bankruptcy Curt's

ruling dated December 10, 2012 in Adversary Proceeding 12-01118 (the "Bond

Decision"), MB shall be deemed to neither have standing in the Chapter 11 Case

nor any Claim, Secured, Unsecured or otherwise, against the Debtor or its estate

whatsoever, with prejudice; or, in the alternative,

(ii)    In the event that MB actually posts the Bond, MB's Allowed amount of Claim

will be determined by the Bankruptcy Court under pending Adversary Proceeding

No. 13-01000 (the "Lender Liability Action"). The Debtor estimates that MB's

Allowed Claim, after full and final adjudication of the Lender Liability Action,

will be reduced to approximately $6,000,000 (the "Allowed Class 2 Claim"), and

thereafter MB shall hold, subject to and conditioned upon the continued

maintenance and existence of the Bond, a second priority lien and security

interest in the Debtor's real property located at 261 East 78th Street, New York,

New York (the "Property"), subject only to the first priority lien to be granted in

favor of the Plan Lender in consideration for the Plan Confirmation Loan  and

shall be repaid in full as follows: the Allowed Class 2 Claim shall be repaid over

a period of no more than twenty (20) years from the Effective Date (the "New

MB Repayment Term"), with monthly interest only payments during the New

MB Repayment Term at the prime rate as announced in the Wall Street Journal

on the Effective Date *plus* 2%, with the outstanding principal balance due and

payable on the earlier of the sale or refinance of the Property or end of the New

44

MB Repayment Term (the "New MB Maturity Date""). There shall be no pre-payment or other similar penalty upon any partial or full pre-payment of the Allowed Class 2 Claim.

Class 2 is impaired pursuant to Section 1124 of the Bankruptcy Code.

(c)     Class 3: Class 3 consists of the Allowed Secured Claims of Hermes. Hermes has filed a Secured proof of Claim in the amount of $3,635,304.07.  The Plan provides for the Class 3 Claim to be treated as follows: to be treated as follows:

(i)     In the event that MB fails to post the Bond, Hermes shall hold a second priority lien and security interest in the Property, subject only to the first priority lien to be granted in favor of the Plan Lender in consideration for the Plan Confirmation Loan,  and shall have an Allowed Class 3 Claim in the amount of $3,635,304.07 and be repaid over a period of no more than twenty (20) years from the Effective Date (the "New Hermes Repayment Term"), with monthly interest only payments during the New Hermes Bank Repayment Term at the prime rate as announced in the Wall Street Journal on the Effective Date *plus* 2%, with the outstanding principal balance due and payable on the earlier of the sale or refinance of the Property or end of the New MB Repayment Term (the "New Hermes Maturity Date""). There shall be no pre-payment or other similar penalty upon any partial or full pre-payment of the Allowed Class 3 Claim.; or, in the alternative:

(ii)     In the event that MB actually posts and maintains the Bond, Hermes shall  hold a third priority lien and security interest in the Property, subject only to the first priority lien to be granted in favor of the Plan Lender in consideration for the Plan

45

Confirmation Loan and the second priority lien granted to the Allowed Class 2

Claim under (b)(ii) above and shall have an Allowed Class 3 Secured Claim in

the amount of $2,500,000, to be repaid in full as follows: the Allowed Class 3

Claim shall be repaid after and conditioned upon repayment of the Allowed Class

2 Claim, if any, in accordance with the Subordination of Mortgage and

Intercreditor Agreement between the Class 2 and Class 3 claimholders dated

September 17, 2009 and shall accrue, but not be paid, interest thereon at the

prime rate as announced in the Wall Street Journal on the Effective Date *plus* 3%.

There shall be no pre-payment or other similar penalty upon any partial or full

pre-payment of the Allowed Class 3 Claim. Hermes in such event shall also have

an Allowed Class 4 Unsecured deficiency Claim in the amount of $1,135,304.07.

Class 3  is impaired pursuant to Section 1124 of the Bankruptcy Code.

(d)     Class 4: Class 4 consists of the claims of Allowed Unsecured Creditors. Class 4

Claims, excluding any possible deficiency Claim of Hermes, totals approximately $2,100,000.

Class 4 Claims shall be treated as follows:

(i)      In the event that MB fails to post the Bond, the holders of Allowed Class 4 Claims

will be paid, subject to repayment first and in full of the Plan Confirmation Loan

and the Allowed Class 3 Claim,  100% of their Allowed Claims upon the sale or

refinance of the Property, with interest thereon at the Federal Rate in existence as

of the Effective Date, which sale or refinance shall occur within no later than  five

(5) years after the Effective Date.; or, in the alternative:

46

(ii)    In the event that MB actually posts and maintains the Bond, Class 4 Allowed Claims will each receive a distribution in the amount of 6.5% of the Allowed amounts of their Claims, in cash, without interest, payable in 120 monthly installments commencing on the first day of the first calendar quarter after the Effective Date.   Class 4 is impaired pursuant to Section 1124 of the Bankruptcy Code.

Class 4 is impaired pursuant to Section 1124 of the Bankruptcy Code.

(e) Class 5: Class 5 consists of the claims of holders of equity interests in the Debtor, Lee Moncho is the 100% holder of the Class 5 Interests. Class 5 shall retain its Interests, subject to acceptance of the Plan by Class 4. Class 5 Equity Interest holders are unimpaired pursuant to Section 1124 of the Code.

(e)    Retiree Benefits

The Debtor has never funded or maintained any retiree benefit plans, funds or programs as defined in Section 1114 of the Bankruptcy Code, for the purpose or providing or reimbursing payments for retired employees or their spouses and dependents for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund or program (through the purchase of insurance or otherwise). Accordingly, the Plan does not make provisions to pay any such benefits under Section 1129(a)(13) of the Bankruptcy Code.

## C.    Acceptance or Rejection of the Plan

### 1. Voting Classes

Each Holder of an Allowed Claim in Classes 2, 3 and 4 shall be entitled to vote to accept or reject the Plan.

47

**2.** **Acceptance By Impaired Classes of Claims**

Classes 2, 3 and 4 shall have accepted the Plan if (i) the Holders (other than any Holder designated under Section 1126(e) of the Bankruptcy Code) of at least two-third in amount of the Allowed Claims actually voting in such class have voted accept the Plan and (ii) more than one-half in number of the Holders (other than any Holder designated under Section 1126(c) of the Bankruptcy Code) of such Allowed Claims actually voting in such class have voted to accept the Plan. Alternatively, the Plan may be confirmed under 11 U.S.C. §1129(b)(2)(A) as to the Class 2, 3 or 4 creditors, or under 11 U.S.C. §1129(b)(2)(B) as to the Class 5 Interest holders.

**3.** **Presumed Acceptance of the Plan**

Classes 1 and 5 are unimpaired under the Plan and therefore are deemed to accept the Plan under Section 1126(f) of the Bankruptcy Code.

**D.** **Miscellaneous Plan Provisions**

**1.** **Resolution Of Disputed Claims & Reserves**

(a)        Objections.  An objection to the allowance of a Claim shall be in writing and may be filed with the Bankruptcy Court by the Debtor or any other party in interest at any time on or before the Effective Date, or within such other time period as may be fixed by the Bankruptcy Court. Notwithstanding the foregoing, the Debtor shall file any and all objections to Claims no later than forty-five (45) days after the Effective Date.

(b)        Amendment of Claims.  A Claim may be amended prior to the Effective Date only as agreed upon by the Debtor and the holder of such Claim and as approved by the Bankruptcy Court or as otherwise permitted by the Bankruptcy Code and Bankruptcy Rules. After the Effective Date, a Claim may be amended as agreed upon by the holder thereof and the

48

Debtor to decrease, but not increase, the face amount thereof.

       (c)       Reserve for Disputed Claims.  The Debtor shall reserve for account of each holder of a Disputed Claim that property which would otherwise be distributable to such holder on such date were such Disputed Claim an Allowed Claim on the Effective Date, or such other property as the holder of such Disputed Claim and the Debtor may agree upon.  The property so reserved for the holder, to the extent such Disputed Claim is allowed, and only after such Disputed Claim becomes a subsequently Allowed Claim, shall thereafter be distributed to such holder.

       (d)       Claims Estimation. The Debtor may, at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to Section 502(c) of the Bankruptcy Code, regardless of whether or not the Debtor has previously objected to such Claim, and the Bankruptcy Court retains jurisdiction to estimate any Claim at any time, including, without limitation, during litigation concerning any objection to such Claim. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount constitutes either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment of such Claim.

       (e)       Distributions to Holders of Subsequently Allowed Claims.  Unless another date is agreed on by the Debtor and the holder of a particular subsequently Allowed Claim, the Debtor shall, within ten (10) days after an Order resolving the Disputed Claim becomes a final Order and non-appealable, distribute to such holder with respect to such subsequently Allowed

49

Claim that amount, in cash, from the cash held in reserve for such holder and, to the extent such reserve is insufficient, from any other source of cash otherwise available to the Debtor, equal to that amount of cash which would have been distributed to such holder from the Effective Date through such distribution date had such holder's subsequently Allowed Claim been an Allowed Claim on the Effective Date. The holder of a subsequently Allowed Claim shall not be entitled to any interest on the Allowed Amount of its Claim, regardless of when distribution thereon is made to or received by such holder. If any amount of the Class 2 claim holder's Disputed Claim is subsequently Allowed, it shall not be paid in cash but shall be added to the Allowed Class 2 Claim and paid in accordance with Section 3.2(b) of the Plan.

(f)       Disputes Regarding Rights to Payments or Distribution. In the event of any dispute between and among Claimants (including the entity or entities asserting the right to receive the disputed payment or distribution) as to the right of any entity to receive or retain any payment or distribution to be made to such entity under this Plan, the Debtor may, in lieu of making such payment or distribution to such entity, remit the disputed portion of the Claim into an escrow account or to a distribution as ordered by a court of competent jurisdiction as the interested parties to such dispute may otherwise agree among themselves. Notwithstanding anything to the contrary, the Debtor shall make distributions on account of the undisputed portion of a Claim to such Claimants.

(g)       Setoff. In accordance with Section 553 of the Bankruptcy Code and applicable non-bankruptcy law, the Plan on account of such Claim at any time before the Final Distribution is made on account of such Claim, the Claims, rights and causes of action of any nature that the Debtor may hold against the holder of such Allowed Claim; provided, however, that neither the

50

failure to effect such a setoff nor the allowance of any Claim hereunder constitutes a waiver or release by the Debtor as a debtor, debtor-in-possession, or a reorganized debtor of any such Claims, rights, and causes of action that the Debtor may possess against such holder.

(h)        <u>Claims Procedures Not Exclusive</u>. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another. On and after the Confirmation Date, Claims which have been estimated may subsequently be compromised, settled, withdrawn, or otherwise resolved without further order of the Bankruptcy Court.

**2. <u>Unclaimed Property</u>**

Except as otherwise provided herein, in the event any Claimant fails to claim any distribution within six (6) months from the date of such distribution, such Claimant shall forfeit all rights thereto, and to any and all future payments, and thereafter the Claim for which such cash was distributed shall be treated as a disallowed Claim. In this regard, distributions to Claimants entitled thereto shall be sent to their last known address set forth on a proof of claim filed with the Bankruptcy Court or if no proof of claim is filed, on the Schedules filed by the Debtor or to such other address as may be designated by a Creditor. The Disbursing Agent, Debtor and Reorganized Debtor shall use their collective best efforts to obtain current addresses for all Claimants. The Disbursing Agent shall notify the Debtor and the Trustee of all returned distributions. All unclaimed cash shall be returned to the Reorganized Debtor.

**3.  <u>Injunctions</u>**

Except as otherwise expressly provided in the Plan, any and all entities who have held, hold or may hold Claims or Interests against or in the Debtor shall, as of the Effective Date, be enjoined from:

(a) commencing, conducting, or continuing, in any manner, any suit, action, or other proceeding of any kind (including, without limitation, in any judicial, arbitral, administrative or other forum) against the Debtor arising out of any act or omission of the Debtor;

(b) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collection or otherwise recovering by any manner or means, whether directly or indirectly, or any judgment, award, decree, or order against the Debtor with regard to such entities' Claim against the Debtor;

(c) creating, perfecting or otherwise enforcing, in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, the property of the Debtor, or any successor-in-interest to the Debtor;

(d) asserting any set off, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the Debtor, the property of the Debtor, or any successor-in-interest to the Debtor; and

(e) acting in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

4. **Exculpation**

**Neither the Debtor, nor the Reorganized Debtor, nor any of their respective members, officers, directors, general partners, managing agents, owners, or employees (acting in such capacity) nor any professional person employed by the Debtor, the Reorganized Debtor or the Trustee, shall have or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, Confirmation or consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with this Chapter 11 Case or the Plan. From and after the Effective Date, a copy of the Confirmation Order and the Plan shall constitute and may be submitted as a complete defense to any claim or liability satisfied, discharged and released pursuant to Article 8 of the Plan; provided, however, that nothing in the Plan shall, or shall be deemed to, release the Debtor or Reorganized Debtor from, or exculpate the Debtor or Reorganized Debtor with respect to, their respective obligations or covenants arising pursuant to the Plan from bad faith, willful misconduct, gross negligence, breach of fiduciary duty, malpractice, fraud, criminal conduct, unauthorized use of confidential information that causes damages, and/or ultra vires acts. If the Plan is confirmed containing releases of liability as to the Debtor and the Reorganized Debtor, creditors will be unable to pursue any claims that are discharged under the Plan, but creditors can pursue claims against the Debtor or the Reorganized Debtor that may arise in the future, or pursuant to the Plan. Any such liability against the**

**Debtor's professionals will not be limited to their respective clients contrary to the requirement of DR 6-102 of the Code of Professional Responsibility.**

5. <u>**Full and Final Satisfaction**</u>

Pursuant to the Plan, all payments and all distributions shall be in full and final satisfaction, settlement, release and discharge of all Claims and Equity Interests, except as otherwise provided in the Plan.

6. <u>**Amendment, Modification, Withdrawal or Revocation of the Plan.**</u>

The Debtor reserves the right, in accordance with the Bankruptcy Code, to amend or modify the Plan prior to the Confirmation Date or as soon as practicable thereafter. After the Confirmation Date, the Debtor may, subject to order of the Bankruptcy Court, and in accordance with Section 1127(b) of the Bankruptcy Code, remedy any defect or omission or reconcile any inconsistencies in the Plan in such manner as may be necessary to carry out the purposes and intent of the Plan.

The Debtors may withdraw or revoke the Plan at any time prior to the Confirmation Date. If the Debtor revokes or withdraws the Plan prior to the Confirmation Date, or if the Confirmation Date does not occur, the Plan will be null and void. In such event, nothing contained in the Plan will constitute a waiver or release of any Claim by or against the Debtor or any other person or to prejudice in any manner the rights of the Debtor or any other person in any further proceedings involving the Debtor.

### 7. <u>Retention of Jurisdiction</u>

The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Case and the Plan pursuant to, and for the purposes of, Sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)    to hear and determine any and all objections to the allowance of any Claims or any controversies as to the classification of any Claims, provided that only the Debtor may file objections to Claims;

(b)    to hear and determine any and all applications by Professionals for compensation and reimbursement of expenses;

(c)    to hear and determine any and all pending applications for the rejection and disaffirmance of executory contracts and unexpired leases, and fix and allow any Claims resulting therefrom;

(d)    to liquidate any Disputed Claim;

(e)    to enforce the provisions of the Plan, including the injunction, exculpation and releases provided for in the Plan;

(f)    to enable the Debtor to prosecute any and all proceedings which have been or may be brought prior to the Effective Date to set aside liens or encumbrances and to recover any transfers, assets, properties, or damages to which the Debtor may be entitled under applicable provisions of the Bankruptcy Code or an federal, state, or local laws;

(g)    to correct any defect, cure an omission, or reconcile any inconsistency in the Plan or in the Confirmation Order as may be necessary to carry out its purpose and the intent of the Plan; and

(h)     to determine such other matters as may be provided for in the Confirmation Order or as may be authorized under the provisions of the Bankruptcy Code.

### 8. <u>Contracts and Unexpired Leases</u>

Any unexpired lease or executory contract that has not been expressly assumed or rejected by the Debtor or has not naturally expired during the course of this Case shall, as of the Effective Date, be deemed to have been assumed by the Debtor.

### 9. <u>Post-Confirmation Fees, Final Decree</u>

The reasonable compensation and out-of-pocket expenses incurred post-Confirmation by professionals retained by the Debtor or the Trustee during this Chapter 11 Case shall be paid by the Reorganized Debtor within ten (10) days upon presentation of invoices for such post-petition professional services. All disputes concerning post-confirmation fees and expenses shall be subject to Bankruptcy Court jurisdiction.

A final decree shall be entered as soon as practicable after distributions have commenced under the Plan.

### 10. <u>Continuation of Bankruptcy Stays</u>

All stays provided for in the Chapter 11 Case under Section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

### 11. <u>Revesting of Assets</u>

On the Effective Date, title to and possession of any and all property of the estate, real or personal, shall be re-vested in the Reorganized Debtor free and clear of all liens, claims, interests and encumbrances of any kind (except for any liens created by purchase money security interests

which are duly perfected and enforceable), subject to and except as otherwise provided in the Plan, and assigned to the Plan Distribution Fund.

**12. <u>Treatment of Equity Interests in Debtor</u>**

Under the Plan, all Class 5 interests will be canceled, except to the extent that any particular Class 5 Interest holder is a participant in the Plan Funder. The equity in the Reorganized Debtor will be issued to the Plan Funder.

**13. <u>Conditions to Effective Date of the Plan</u>**

The Plan shall not become effective unless and until the following conditions shall have been satisfied or waived pursuant to Section 11.2 of the Plan:

(a)    the Confirmation Order shall have been entered by the Bankruptcy Court and shall have become a Final Order; and

(b)    all actions, other documents and agreements necessary to implement the Plan shall have been effected or executed and delivered.

In the event that one or more of the conditions specified in Section 11.2 of the Plan have not occurred on or before ten (10) days after the Confirmation Date, upon notification submitted by the Debtor to the Bankruptcy Court (a) the Confirmation Order shall be vacated, (b) no distributions under the Plan shall be made, (c) the Debtor and all holders of Claims and Equity Interests shall be restored to the <u>status quo ante</u> as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred and (d) the Debtor's obligations with respect to the  Claims and Equity Interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claim or Equity Interests by or against the Debtor or any other Person or to prejudice in any manner the rights of

57

the Debtor or any Person in any further proceedings involving the Debtor.

## IV.  PLAN CONFIRMATION AND EXECUTION

The following is a brief summary of the provisions of the Bankruptcy Code respecting acceptance and confirmation of a plan of reorganization. Holders of Claims and Equity Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or to consult their own attorneys.

**Means For Execution.** The Plan will be funded by the Debtor's continuing operations and the Plan Confirmation Loan, which will be used to pay administration creditors and build out additional floors for renal. See Projections annexed hereto as Exhibit "C".

Plan Confirmation Loan. The Debtor has obtained an informal commitment from Cedar Hill Holdings ("Cedar Hill") for $1 million in post-Effective Date tenant improvement financing. A copy of the Letter of Intent is annexed hereto as Exhibit "C". The Debtor intends to use the proceeds to complete the 2 remaining unfinished floors and to modify the 5th floor, which will generate an additional $40,500 in monthly rental income, which in of itself is sufficient to carry the debt service associate d with the Plan Confirmation Loan.

The Loan will bear interest at the rate of 9% per annum, with a 3% commitment fee payable at closing and an additional 6% exit fee payable upon satisfaction. The loan has an initial term of 1 year.

The Loan will be secured by a first priority mortgage lien upon the Property, senior to the liens, if Allowed, of the Class 2 and Class 3 Secured Creditors.

Such a priming lien is permitted by this Court. See In re 495 Central Avenue Corp., 136

B.R. 626 (Bkrtcy. S.D.N.Y. 1992)(Schwartzberg, J.)(Super-priority lien granted over objection of

undersecured mortgagee where debtor demonstrated adequate protection and inability to obtain

other financing on less stringent terms).

In re 495 Central Avenue Corp., 136 B.R. at 631, wherein this Court stated:

> "In effect, a substitution occurs in that the money
> spent for improvements will be transferred
> into value.  This value will serve as adequate
> protection for Hancock's secured claim."

The Debtor can demonstrate that the build out of the 5th and 6th floors from the Plan

Confirmation Loan will result in the Property having an improved value in excess of the funds

being lent by the Funder, thereby providing the Class 2 and 3 Secured claimholders with

adequate protection as required by Section 364(d)(1)(B) of the Bankruptcy Code. The build out

will result in (a) sufficient additional monies being available to service the Plan Confirmation

Loan  debt service and (b) a return to the Debtor, in the form of increased property value, over

and above the amounts being advanced pursuant to the Plan Confirmation Loan, thereby

providing adequate protection to the Class 2 and Class 3 claimholders  and enhancing the value

of their collateral, i.e., the Property.

Judge Schwartzberg in the 495 Central case determined that as long as the Debtor could

prove that the improvements to the subject property will increase the value of the property in

excess of the amount of the proposed senior loan, that the secured part(ies) would be given

adequate protection within the meaning of Section 364(d). Id., 136 B.R. at 626, 631.  Therefore,

under the test enumerated in this Circuit in the 495 Central case, the Debtor herein is giving the

Class 2 and 3 Secured claimholders adequate protection and may thus justify the obtaining of senior secured financing.

**Requirements For Confirmation Of Plan.** This Disclosure Statement is provided in connection with the solicitation of acceptances of the Plan. The Bankruptcy Code defines acceptance of a plan or reorganization by a class of Claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of the allowed Claims of that class that have actually voted or are deemed to have voted to accept or reject a plan. The Bankruptcy Code defines acceptance of a plan of reorganization by a class of interests as acceptance by at least two-thirds in amount of the allowed interests of that class that have actually voted or are deemed to have voted to accept or reject a plan. The Bankruptcy Court will confirm the Plan only if it finds that all of the requirements of Section 1129(a) or (b) of the Bankruptcy Code are met. Among the requirements for confirmation of a plan are that the plan (i) is accepted by all impaired Classes of Claims and Interests or, if rejected or deemed rejected by an impaired Class, (ii) with respect to a class of secured creditors, allows said creditors to retain their lien and receive the indubitable equivalent of their interest in the Estate's interest in property on which they have a lien; (iii) "does not discriminate unfairly" and is "fair and equitable" as to each rejecting class; (iv) is feasible; and (v) is in the "best interest" of Creditors and Interest Holders impaired under the Plan.

**Solicitation of Votes.** Each Holder of a Claim in Classes 2, 3 and 4 have been sent a ballot together with this Disclosure Statement. The ballot is to be used for voting to accept or reject the Plan.

The Bankruptcy Court has directed that, to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be mailed or delivered by hand or courier so that they are <u>ACTUALLY RECEIVED</u> no later than 5:00 p.m. (Eastern Standard Time) on May __, 2013, at the following address:

**DelBello Donnellan Weingarten Wise & Wiederkehr, LLP**
**One North Lexington Avenue**
**White Plains, NY 10601**
**Attn: Jonathan S. Pasternak, Esq.**

**TO BE COUNTED. YOUR BALLOT MUST BE ACTUALLY RECEIVED BY 5:00 P.M. (EASTERN STANDARD TIME) ON MAY __, 2013**

Each Holder of an Allowed Claim in Classes 2, 3 and 4 shall be entitled to vote to accept or reject the Plan as provided for in the order approving the Disclosure Statement. A vote may be disregarded if the Bankruptcy Court determines that such vote was not solicited or procured in good faith and in accordance with the Bankruptcy Code.

All Holders of Class 1 Claims and Class 5 Interests are deemed unimpaired under the Plan, such Holders are deemed to accept the Plan and, accordingly, are not entitled to vote on the Plan.

**<u>Cramdown With Respect to Secured Creditors -</u>**

In order for the Plan to be confirmed over the objection of a dissenting secured creditor, the Plan must provide that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed

amount of such claim, of a value, as of the effective date of the plan, of at least the value of such

holder's interest in the estate's interest in such property. See 11 U.S.C. §1129(b)(2)(A).

Under the seminal case Till v. SCS Credit Corp., 541 U.S. 465, 124 S.Ct.1951 (2004),

where no efficient market exists to determine the appropriate interest rate, the Court can establish

a formula for establishing a fair and equitable return/interest rate of the Prime Rate plus 2% for

providing a secured creditor with the indubitable equivalent of the money owed to it. In this case,

the Class 2 and Class 3 Secured Creditors are "oversecured" by virtue of the current $13,000,000

fair market value of the Property and therefore enjoy an "equity cushion" justifying a market rate

of interest as that proposed in the Plan.

The Till decision holds for the following:

> The Bankruptcy Code provides little guidance as to which of the
> rates of interest advocated by the four opinions in this case-the
> formula rate, the coerced loan rate, the presumptive contract rate,
> or the cost of funds rate-Congress had in mind when it adopted the
> cramdown provision. That provision, 11 U.S.C. § 1325(a)(5)(B),
> does not mention the term "discount rate" or the word "interest."
> Rather, it simply **474** requires bankruptcy courts to ensure that the
> property to be distributed to a particular secured creditor over the
> life of a bankruptcy plan has a total "value, as of the effective date
> of the plan," that equals or exceeds the value of the creditor's
> allowed secured claim-in this case, $4,000. § 1325(a)(5)(B)(ii).

> * * *

> Thus, unlike the coerced loan, presumptive contract rate, and cost
> of funds approaches, the formula approach entails a
> straightforward, familiar, and objective inquiry, and minimizes the
> need for potentially costly additional evidentiary proceedings.
> Moreover, the resulting "prime-plus" rate of interest depends only
> on the state of financial markets, the circumstances of the
> bankruptcy estate, and the characteristics of the loan, not on the
> creditor's circumstances or its prior interactions with the debtor.

62

For these reasons, **1962** the **480** prime-plus or formula rate best comports with the purposes of the Bankruptcy Code.[FN19]

FN19. The fact that Congress considered but rejected legislation that would endorse the Seventh Circuit's presumptive contract rate approach, H.R. 1085, 98th Cong., 1st Sess., § 19(2)(A) (1983); H.R. 1169, 98th Cong., 1st Sess., § 19(2)(A) (1983); H.R. 4786, 97th Cong., 1st Sess., § 19(2)(A) (1981), lends some support to our conclusion. It is perhaps also relevant that our conclusion is endorsed by the Executive Branch of the Government and by the National Association of Chapter Thirteen Trustees. Brief for United States as *Amicus Curiae;* Brief for National Association of Chapter Thirteen Trustees as *Amicus Curiae.* If we have misinterpreted Congress' intended meaning of "value, as of the date of the plan," we are confident it will enact appropriate remedial legislation.

As to the appropriate method of establishing a rate of interest that may be permitted under a plan, the Court continued:

We do not decide the proper scale for the risk adjustment, as the issue is not before us. The **Bankruptcy** Court in this case approved a risk adjustment of 1.5%, App. to Pet. for Cert. 44a-73a, and other courts have generally approved adjustments of 1% to 3%, see *In re Valenti,* 105 F.3d 55, 64 (C.A.2) (collecting cases), abrogated on other grounds by *Associates Commercial Corp. v. Rash,* 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997). Respondent's core argument is that a risk adjustment in this range is entirely inadequate to compensate a creditor for the real risk that the plan

In the case at bar, in light of the distressed capital markets and resulting lack of available financing to similarly situated Chapter 11 single asset real estate debtors, there currently exists no "lending" market to determine an appropriate market interest rate.

The Court should, in conjunction with the confirmation of the Plan, hold a hearing to determine the following issues: "(1) does an efficient market rate exist for the type of loan

(Chase) is forced to give the debtor under the … (plan); (2) if there is no efficient market rate and it is thus appropriate to apply <u>Till</u> formula, what was the national prime rate on the relevant date; (3) is it appropriate to use the national prime rate or some other rate; and (4) to what extent is it appropriate to deviate from the applicable rate to account for risk." <u>Mercury Capital Corp. v. Milford Connecticut Associates, L.P.</u> 354 B.R. 1, 13 (D.Conn.,2006). The Debtor believes that the <u>Till</u> case is on point and requires in the case at bar the implementation of a formula approach which, under the circumstances at bar, justifies a prime plus 2 rate of interest as proposed for Class 2, which has a significant equity cushion of approximately $2,500,000 (assuming its Claim is allowed, if at all, at $6 million) and a prime plus 3 rate for the Class 3 Secured claimholder under the Plan.

**D.    Confirmation**

   **1.   <u>Confirmation Hearing</u>**

   Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. Notice of the Confirmation Hearing of the Plan has been provided to all known holders of Claims and Equity Interests or their representatives along with this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent Confirmation Hearing. At the Confirmation Hearing, the Bankruptcy Court will (i) determine whether the Plan has been accepted by the requisite majorities of each voting class; (ii) hear and determine all objections to the Plan and to confirmation of the Plan; (iii) determine whether the Plan meets the requirements

of the Bankruptcy Code and has been proposed in good faith; and (iv) confirm or refuse to confirm the Plan.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to Confirmation of the Plan must be in writing, must conform with the Bankruptcy Rules and the Local Rules of the Bankruptcy Court, must set forth the name of the objectant, the nature and amount of Claims or Equity Interests held or asserted by the objectant against the Debtor's Estates or property, and the basis for the objection and the specific grounds in support thereof. Such objection must be filed with the Bankruptcy Court together with proof of service thereof, and served upon counsel to the Debtor, Rattet, Pasternak & Gordon Oliver, LLP, 550 Mamaroneck Avenue, Suite 510, Harrison, New York 10528, Attn: Jonathan S. Pasternak, Esq., so as to be received no later than the date and time designated in the notice of the Confirmation Hearing.

## 2.   **Statutory Requirements for Confirmation of the Plan**

At the Confirmation Hearing, the Debtor will request that the Bankruptcy Court determine that the Plan satisfies the requirements of Section 1129 of the Bankruptcy Code. If so, the Bankruptcy Court shall enter an order confirming the Plan. The applicable requirements of Section 1129 of the Bankruptcy Code are as follows:

(a)     The Plan must comply with the applicable provisions of the Bankruptcy Code;

(b)     The Debtor must have complied with the applicable provisions of the Bankruptcy Code;

(c)     The Plan has been proposed in good faith and not by any means forbidden by law;

65

(d)     Any payment made or promised to be made by the Debtor under the Plan for services or for costs and expenses in, or in connection with, this Chapter 11 case, or in connection with the Plan and incident to the Reorganization Case, has been disclosed to the Bankruptcy Court, and any such payment made before Confirmation of the Plan is reasonable, or if such payment is to be fixed after Confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(e)     The Debtor has disclosed the identity and affiliation of any individual proposed to serve, after Confirmation of the Plan, as a director, officer, or voting trustee of the Debtor under the Plan. Moreover, the appointment to, or continuance in, such office of such individual, is consistent with the interests of holders of Claims and Equity Interests and with public policy, and the Debtor have disclosed the identity of any insider that the Reorganized Debtor will employ or retain, and the nature of any compensation for such insider.

(f)     Feasibility and "Best Interest" Tests: The Bankruptcy Code requires that in order to confirm the Plan the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor (the "Feasibility Test"). For a plan to meet the Feasibility Test, the Bankruptcy Court must find that the Debtor is unlikely to face the need for liquidation or the need for further financial reorganization, unless same is provided for in the Plan. The Plan is feasible based on the Debtor's current net operating income, which provides sufficient monies to cover the proposed payments to Class 2 and 3 Secured Creditors as well as the future dividends to Class 4 Unsecured Creditors. In addition, the Plan Funder will contribute up to $200,000 to pay for the Allowed Professional Fee Administrative Claims and  to otherwise establish a working capital reserve for

66

the Property. In addition, the Bankruptcy Court must determine that the values of the distributions to be made under the Plan to each Class will equal or exceed the values which would be allocated to such Class in a liquidation under Chapter 7 of the Bankruptcy Code (the "Best Interest Test"). The Best Interest Test with respect to each impaired Class requires that each holder of a Claim or Interest in such Class either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code.

To determine if the Plan is in the best interest of each class, the probable results of Chapter 7 liquidation must be compared with the results proposed under the Plan. The Debtor believes that in the event of a Chapter 7 liquidation, , the conversion of the Debtor's case to a Chapter 7 proceeding would result in additional administrative expenses, i.e., trustee fees, commissions, and additional attorneys fees, all of which would diminish the ultimate distribution to Holders of Class 4 General Unsecured Claims. Furthermore, there would be a delay in the continued marshalling of the Debtor's assets including the pursuit of litigation which would cause a delay in the distribution to the creditors. Therefore, the Plan proposes to maximize the value of the assets in the most cost-efficient manner.

Feasibility. Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor or any successor to the Debtor under the Plan, unless the Plan expressly provides for liquidation. The Plan is feasible based on the Debtor's payment history, operating performance and expected continued and future stabile operations. See Projections, Exhibit "C". Accordingly, the Plan is feasible within the meaning of

67

the Bankruptcy Code.

(g)    The Plan therefore satisfies all of the statutory requirements of Chapter 11 of the Bankruptcy Code, including the "best interest" and feasibility requirements. The Plan is "fair and equitable" and "does not discriminate unfairly". The Plan complies with all other requirements of Chapter 11 of the Bankruptcy Code and the Plan has been proposed in good faith.

**Plan Execution**

The Plan will be funded by the Debtor's continued operations and the Plan Confirmation Loan which will be used to build out the 5th and 6th floors and increase overall rental income.

**Financial Information**

(a)    Debtor's Schedules of Assets and Liabilities. Schedules of the Debtor's assets and liabilities have been respectively filed with the Clerk of the Court and may be inspected by all interested parties.

The Estimated Amounts Required On Confirmation:

General Administrative Expense Claims (Category 1 + Category 3)          $75,000

**TOTAL**                                                                **$75,000**

(b)    Liquidation Analysis. If this case were liquidated under Chapter 7 of the Bankruptcy Code as opposed to the means set forth herein, the Class 4 General Unsecured Claimants will likely receive no distribution. Under the Plan, the Class 4 Creditors are either receiving 100% payment in the event that MB fails to post the Bond or a 6.5% total dividend in the event that MB actually posts the Bond.

THE DEBTOR THEREFORE RECOMMENDS ACCEPTANCE OF THE PLAN. CREDITORS SHOULD ALSO CONSULT AMONG THEMSELVES AND THEIR COUNSEL IN DETERMINING WHETHER TO ACCEPT THE PLAN.

## V. **POST-CONFIRMATION MATTERS**

**A.      Disbursement of Funds and Delivery of Distribution**

The disbursing agent shall be the Reorganized Debtor.

Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole cent (rounding down in the case of .50 or less and rounding up in the case of more than .50).

The Debtor shall establish a reserve from available cash necessary in order to satisfy post-confirmation fees and expenses of the Professionals and the Disbursing Agent, respectively.

**B.      Unclaimed Cash**

Except as otherwise provided herein, in the event any Claimant fails to claim any distribution within six (6) months from the date of such distribution, such Claimant shall forfeit all rights thereto, and to any and all future payments, and thereafter the Claim for which such cash was distributed shall be treated as a disallowed Claim. In this regard, distributions to Claimants entitled thereto shall be sent to their last known address set forth on a proof of claim filed with the Bankruptcy Court or if no proof of claim is filed, on the Schedules filed by the Debtor, as may have been amended from time to time, or to such other address as may be designated by a Creditor, such notification having been received at least two (2) weeks prior to a distribution so as to allow the Debtor adequate time to update their records. In the case of

69

distributions to entities which are returned due to an incorrect, incomplete or out of date address, the Debtor, in its sole discretion, shall take those steps deemed reasonable and appropriate to ascertain a correct or new address of any such entity. Nothing contained in the Plan or this Disclosure Statement will require the Debtor to attempt to locate any holder of an Allowed Claim.  If after such reasonable and appropriate steps, a correct or new address cannot be found, then such entity shall forfeit all rights to such unclaimed distribution, which shall be deposited into the Plan Distribution Fund for redistribution to the Class 5 General Unsecured Claimants.

**C.     Avoidance and Recovery Actions**

As of and subject to the occurrence of the Effective Date, the Debtor and the Reorganized Debtor, for and on their respective behalves and respective Estates, will waive and release any of the Causes of Action under Sections 510, 544, 547, 548, 550 and 553 of the Bankruptcy Code. The Debtor believe, after a thorough investigation and review with its counsel, that there are no Causes of Action under Section 510, 544, 547, 548, 550 and 553 of the Bankruptcy Code that would provide a meaningful source of funds for the Debtor.

**D.     Events of Default**

The occurrence of any of the following events shall constitute an event of default under the Plan ("Event of Default"):

(a) The failure of the Debtor to make any payment required to be made under the Plan, which failure shall have remained uncured for a period of ten (10) days after the date such payment is required to be made, unless the time for such payment has been extended in accordance with the Plan.

(b) The failure of the Debtor to comply with any of the covenants contained in the Plan,

70

which failure shall remain uncured for a period of ten (10) days after the Debtor have received

written notice of such failure.

In the event that the Debtor defaults under the provisions of the Plan, and such default is

not cured, then, at the option of any creditor or the United States Trustee, a motion may be filed

with the Bankruptcy Court seeking an Order of the Bankruptcy Court compelling the Debtor to

make such payment or act in a manner consistent with the provisions of the Plan or seeking the

conversion this Chapter 11 Case to a Chapter 7 proceeding.

## VI. <u>TAX CONSEQUENCES OF CONFIRMATION,</u>

Confirmation may have federal income tax consequences for the Debtor and holders of

Claims and Interests. The Debtor have not obtained and does not intend to request a ruling from

the Internal Revenue Service (the "IRS"), nor have the Debtor obtained an opinion of counsel

with respect to any tax matters.  Any federal income tax matters raised by confirmation of the

Plan are governed by the Internal Revenue Code and the regulations promulgated thereunder.

Creditors and holders of Interests are urged to consult their own counsel and tax advisors as to

the consequences to them, under federal and applicable state, local and foreign tax laws, of the

Plan.  The following is intended to be a summary only and not a substitute for careful tax

planning with a tax professional.  The federal, state and local tax consequences of the Plan may

be complex in some circumstances and, in some cases, uncertain.  Accordingly, each holder of a

Claim or Interest is strongly urged to consult with his or her own tax advisor regarding the

federal, state and local tax consequences of the Plan, including but not limited to the receipt of

cash and/or stock under this Plan.

71

A.    **Tax Consequences to the Debtor.**

The Debtor may not recognize income as a result of the discharge of debt pursuant to the Plan because Section 108 of the Internal Revenue Code provides that taxpayers in bankruptcy proceedings do not recognize income from discharge of indebtedness.  However, a taxpayer is required to reduce its "tax attributes" by the amount of the debt discharged.  Tax attributes are reduced in the following order:  (i) net operating losses; (ii) general business credits; (iii) capital loss carryovers; (iv) basis in assets; (v) passive activity loss and credit carryovers; and (vi) foreign tax credit carryovers.

B.    **Tax Consequences to Unsecured Creditors.**

An unsecured creditor that receives cash in satisfaction of its Claim may recognize gain or loss, with respect to the principal amount of its Claim, equal to the difference between (i) the creditor's basis in the Claim (other than the portion of the Claim, if any, attributable to accrued interest), and (ii) the balance of the cash received after any allocation to accrued interest.  The character of the gain or loss as capital gain or loss, or ordinary income or loss, will generally be determined by whether the Claim is a capital asset in the creditor's hands.  A creditor may also recognize income or loss in respect of consideration received for accrued interest on the Claim. The income or loss will generally be ordinary, regardless of whether the creditor's Claim is a capital asset in its hands.

## VII. <u>ALTERNATIVES TO THE PLAN AND CONSEQUENCES OF NOT CONFIRMING</u>

Among the possible consequences if the Bankruptcy Court should not confirm the Plan are the following: (1) an alternative plan could be proposed or confirmed; (2) the Trustee could

liquidate the Subject Property and pursue avoidance actions; or (2) the Chapter 11 Cases could be converted to liquidations under Chapter 7 of the Bankruptcy Code.

## A.    Alternative Plans

As previously mentioned, with respect to an alternative plan, the Debtor and its professional advisors have explored various alternative scenarios and believe that the Plan enables the holders of Claims to realize the maximum recovery under the circumstances. The Debtor believes that the Plan is the best plan that can be proposed and serves the best interest of the Debtor and other parties-in-interest.

## B.    Trustee's Sale of Subject Property or Chapter 7 Liquidation

The Debtor believes that if this Chapter 11 case was converted to Chapter 7 liquidation, the Class 4 General Unsecured Creditors would receive no distribution on account of their claims or at the very best, a minimal distribution and only after a likely delay in the marshaling of the Debtor's assets including the pursuit of litigation which would cause a delay in a distribution to creditors.

## VIII. RECOMMENDATION AND CONCLUSION

The Debtor and its professional advisors have analyzed different scenarios and believe that the Plan is preferable to a conversion to cases under Chapter 7 of the Bankruptcy Code. The Plan will provide greater recoveries than those available in liquidation to all holders of Claims. Any other alternative would cause significant delay and uncertainty, as well as substantial administrative costs.  If the Plan is not confirmed, the continuation of the bankruptcy proceeding is likely to have an immediate adverse impact, perhaps irreparable, on the Debtor's long term viability.

73

ACCORDINGLY, THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST RECOVERY POSSIBLE FOR CLAIMHOLDERS AND THE DEBTOR STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

THE FOREGOING IS A BRIEF SUMMARY OF THE PLAN AND SHOULD NOT BE RELIED ON FOR VOTING PURPOSES. THE PLAN REPRESENTS A PROPOSED LEGALLY BINDING AGREEMENT BETWEEN THE DEBTOR AND ITS CREDITORS, AND SHOULD BE READ TOGETHER WITH THIS DISCLOSURE STATEMENT IN ORDER THAT AN INTELLIGENT AND INFORMED JUDGMENT CONCERNING THE PLAN CAN BE MADE.

Dated: New York, New York
        March 15, 2013

                    2561 EAST 78 REALTY CORPORATION



                    By:/s/_____
                        Lee Moncho, President